Filed 8/7/14  P. v. Lewis CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MELVIN CHARLES LEWIS,<br><br>    Defendant and Appellant. | F066495<br><br>(Super. Ct. No. MCR035047A)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Barbara Michel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Leanne Le Mon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Kane, Acting P.J., Detjen, J., and Franson, J.

## INTRODUCTION

Appellant and defendant, Melvin Charles Lewis, was charged in an amended information filed on September 3, 2010, with transporting cocaine base (Health & Saf. Code, § 11352, subd. (a), count 1) and possessing cocaine base for the purpose of sale (Health & Saf. Code, § 11351.5, count 2). The amended information further alleged that defendant had two prior convictions within the meaning of Health and Safety Code section 11370.2, subdivision (a) and a prior prison term enhancement (Pen. Code, § 667.5, subd. (b)). Defendant's first trial ended on October 14, 2010, with a mistrial.

Defendant's retrial began on October 1, 2012. On October 3, 2012, the trial court denied defendant's motion for a mistrial. On October 9, 2012, the jury convicted defendant of both counts. In a bifurcated proceeding, defendant waived his constitutional rights and admitted the enhancement allegations. On January 4, 2013, the trial court sentenced defendant to a total term of 11 years in county jail. Defendant was awarded 289 days of presentence custody credits.

Defendant contends on appeal that the trial court abused its discretion in denying his motion for mistrial based on the arresting officer's reference to prior narcotics convictions. The trial court advised the jury with instructions to disregard the officer's testimony in this regard. We affirm the judgment.

## FACTS

*Execution of Search Warrant on Defendant's Residence*

Madera Police Officer Shant Sheklanian has significant training and experience with narcotics trafficking, sales, and possession. Sheklanian is cross-deputized as a federal marshal with the Fugitive Apprehension Team, has experience working with the Drug Enforcement Administration, and is a member of the Community Response Unit (CRU). Sheklanian's partner, Officer Jason Gutknecht, is also well trained in drug

2

trafficking.  In April 2009, the CRU was focused on narcotics trafficking in Madera.

Officers Kutz and Paul, and Sergeant Autry were also members of the CRU.

On April 24, 2009, the CRU prepared to execute a search warrant at a residence occupied by defendant and his girlfriend, Brandi Williams, on Pescara Way in Madera. Defendant and Williams were suspected of conducting drug sales.  Sheklanian was the case agent in charge of the investigation.  The officers waited outside defendant's home to execute the warrant because narcotics dealers often keep their drugs in a place where they can flush them down the toilet if the police arrive.

When defendant left his house, Kutz radioed Gutknecht and informed him defendant was approaching his position.  Williams was sitting in the front passenger seat of defendant's car.  Kutz activated his red and blue emergency lights to stop defendant. Sheklanian pulled in behind Gutknecht with his own vehicle.  When police emergency lights are activated in a residential neighborhood, the driver usually pulls over immediately.  Defendant did not pull over immediately, but drove about three-tenths of a mile, or about four city blocks, before pulling over to an apartment complex and stopping.

Gutknecht detained defendant and Sheklanian detained Williams.  Cell phones were confiscated from both defendant and Williams.  Sheklanian handed Gutknecht a cell phone that was ringing.  When Gutknecht answered it, a caller asked for defendant.  The phone was constantly ringing, at least 20 or 30 times, while defendant and Williams were being detained.

Defendant and Williams both had driver's licenses with the address for the search warrant.  Defendant had $153 in small denominations in his wallet.  Williams had $411 in the wallet found in her purse.  Williams testified that she and defendant were not employed at the time of their arrest.  Williams and defendant were brought back to their residence on Pescara Way so officers could execute the search warrant.

3

Sheklanian searched the master bedroom of the defendant-Williams residence. Sheklanian found a backpack with $450 in mostly small currency. Sheklanian found a Cricket phone bill addressed to Williams for that address. Drug dealers commonly have two or more cell phones. One phone is typically a "clean" phone for friends and family. Drug dealers will have another phone from Cricket for drug transactions because unlike other carriers, Cricket does not require personal information for one to become a subscriber on its network. This makes it more difficult for law enforcement to wiretap the phone or subpoena phone records.

Sergeant Autry answered one of the cell phones and conversed with someone who identified herself as Sheri. Sheri asked if she could have "3 for 25." This meant that the caller wanted three rocks of cocaine for $25. Gutknecht found a pipe underneath a couch cushion that was used for smoking methamphetamine. There was burnt white residue on the bottom of the bulbous part of the pipe.[1] Williams testified that the pipe belonged to her. Williams claimed that she was the only one using drugs, defendant was not using drugs, and she did not use drugs in front of defendant.

Female Officers Paul and Keiser took Williams to the garage during the search. Williams did not appear to be under the influence of any drug. Although Williams was initially calm, she became upset and was crying. Williams said she had last used drugs one or two months earlier. The officers asked Williams if she had anything illegal on her person. Williams told the officers that defendant handed her drugs. Williams admitted she had drugs inside her underwear. Paul undid Williams's pants and retrieved a bag of rock cocaine from her pants.[2]

---

[1] Methamphetamine was not found in the residence.

[2] The officers recorded their questioning of Williams and Williams's replies. The recording was played to the jury.

4

The bag was turned over to Sheklanian. It contained 25 smaller wrapped bindles of rock cocaine. A single bindle weighed .15 grams and all of the bindles were a similar size. Drug users could not use 25 bindles of rock cocaine in a day and maintain a normal home. Williams's residence was very clean and well kept. The typical rock cocaine user carries one or two rocks with them. Pre-packaging bindles of drugs in set quantities makes sales of the drugs easy and quick by way of hand-to-hand transactions that draw little attention.

Sheklanian opined that defendant and Williams possessed the cocaine base for sale. Sheklanian based his opinion on several facts. Williams had 25 separate bindles, individually packaged that were also the same size and weight. Defendant and Williams had cell phones and received 25 calls on one phone and 26 calls on the other. Defendant and Williams had cash in small bills and separate locations in the amounts of $450, $411, and $153.

Sheklanian explained that drug dealers are aware police officers are going to search a male more thoroughly than a female and commonly use female companions who carry narcotics for them. Women hide contraband in their bras and panties because they know a police officer is not going to touch those places during a regular patdown search. Because defendant took a long time to pull over, he had plenty of time to give the rock cocaine to Williams.

***Testimony of Defendant's Prior Convictions and Court's Admonition to Jury***

During trial, Sheklanian said that defendant had been arrested, convicted, and sent to prison twice. Defense counsel immediately objected that the statement assumed facts not in evidence and the court excused the jury. The court told the prosecutor he could introduce evidence that defendant had been arrested for possession of narcotics, but not that he had prior convictions. The prosecutor explained that he did not admonish Sheklanian not to mention the convictions, but did not expect him to talk about them.

5

The court indicated it would admonish the jury that there was no evidence before it that defendant had a prior conviction or had been to prison.

Defense counsel moved for a mistrial, arguing that the bell had been rung and it could not be unrung. The court denied defendant's motion for a mistrial and found generally that evidence of defendant's prior drug transactions was prejudicial, but highly probative to show the identity of the possessor as well as to show the knowledge and intent of the possessor.

The court told the jury that it had stricken Sheklanian's testimony to the prosecutor's last question and the jury would not hear any evidence concerning defendant going to prison or being convicted, such information was irrelevant, and the jury was not to consider it in any way. The court further instructed the jury that defendant's punishment was totally irrelevant on the issue of guilt and the evidence the jury was hearing was only relevant to show the identity of the perpetrator, or the knowledge and intent of the perpetrator.

### Evidence of Defendant's Prior Arrests

Officer Jeremy Harlow testified that on August 16, 2006, he was on routine patrol when he saw defendant driving. Harlow was aware defendant did not have a valid driver's license. Defendant pulled over without being stopped by Harlow. Harlow's search of defendant's car yielded a baggie with 13 individually wrapped doses of rock cocaine in the car collectively weighing 4.2 grams. There were no devices to ingest cocaine in the car. Defendant had two cell phones and $1,800 in cash. Harlow believed defendant possessed cocaine base for sale.

Sergeant Giachino Chiaramonte participated in the execution of a search warrant on August 28, 2006, on a home defendant shared with his mother. Defendant was detained after he left his residence. He was carrying a Cricket cell phone. Inside defendant's bedroom, investigators found one-by-one inch plastic resealable baggies used

6

as packaging material and $490 in cash in male clothing in the closet. On the floor in the bedroom near the foot of the bed, investigators also found a pair of pants with two plastic bags in a pocket. One of those plastic bags contained cocaine base residue. Defendant pulled a bag from his buttocks with 82 individually wrapped pieces of cocaine base weighing 19.2 grams. Chiaramonte opined that defendant possessed the drugs for sale.

*Defense Evidence*

Williams described defendant as a good friend and dated him off and on over the past six years. Williams admitted that as a result of the events that transpired in this case, she pled guilty to possession of drugs for sale. Williams said she lied to police when she told them defendant handed the drugs to her. Williams said defendant was not selling drugs, he did not know she had drugs in her underwear, and the two were not working together.

Williams thought she was high on drugs when she talked to the police officers. Williams said she was using both methamphetamine and cocaine base. Williams explained that she did not remember answering the officers' questions. Williams denied that she or defendant were drug dealers and stated that she bought the 25 packets from a drug dealer whose name she did not remember. Williams said she probably could smoke 25 rocks of cocaine in one day. Just prior to her arrest, Williams received a tax refund of a little over $5,800. Williams gave some money to defendant and had money in her purse to pay bills.

## OTHER CRIMES EVIDENCE

Defendant contends that the other crimes evidence admitted by the trial court, as well as Officer Sheklanian's testimony concerning his convictions and imprisonment, was unduly prejudicial and require the reversal of his convictions. Defendant calls the "highly inflammatory" evidence concerning other crimes "the skunk in the jury box."

7

Generally, evidence that a defendant has committed crimes other than those for which he or she is on trial is inadmissible to prove bad character, predisposition to criminality, or the defendant's conduct on a specific occasion. Evidence Code section 1101, subdivision (b), however, permits evidence of a defendant's past criminal acts when identity, motive, or knowledge are relevant to prove a material fact at issue. Evidence of prior drug use and convictions is generally admissible under Evidence Code section 1101, subdivision (b) to establish that drugs were possessed for sale rather than for personal use and to prove knowledge of the narcotic nature of the drugs.[3] (*People v. Williams* (2009) 170 Cal.App.4th 587, 607 (*Williams*).)

A trial court should grant a motion for mistrial only when a defendant's chance of receiving a fair trial has been irreparably damaged. The prejudice must be incurable by admonition or instruction. Whether a particular incident is incurably prejudicial is speculative by its nature. The trial court is vested with considerable discretion in ruling on motions for mistrial. We review the trial court's ruling on a motion for mistrial for abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 573 (*Avila*); see also *People v. Lightsey* (2012) 54 Cal.4th 668, 718.) In *Avila*, reference to a defendant being recently in prison was cured by the trial court's admonition to the jury to not consider the statement for any purpose. (*Avila*, at p. 574.) The jury is presumed to have followed the court's instructions. (*Ibid.*; *People v. Boyette* (2002) 29 Cal.4th 381, 436.)

Defendant's right to a fair trial was not undermined by the trial court when, following Evidence Code section 1101, subdivision (b), it permitted Officers Sheklanian, Harlow, and Chiaramonte to testify concerning defendant's prior arrests in 2006 for

---

[3]    The *Williams* case further found that evidence of prior arrests that did not result in convictions was inadmissible as proof of guilt or for impeachment. (*Williams, supra,* 170 Cal.App.4th at p. 610.) Because defendant was convicted of the drug offenses referred to by Officers Harlow and Chiaramonte, they could be used to show identity, knowledge, and intent pursuant to Evidence Code section 1101, subdivision (b).

narcotics sales. These incidents were relevant to show that defendant had knowledge of the nature of illegal narcotics and to show his intent to sell rather than to merely possess rock cocaine for his personal use.

Officer Sheklanian also referred to defendant's prior convictions for drug sales and his time in prison for those offenses. The court admonished the jury that it was to disregard these statements because they were stricken from the record. The court further advised the jury that any reference to defendant's other crimes was admitted solely for the purpose of establishing identity, or the defendant's knowledge and intent. On appellate review, we presume that the jury followed the trial court's instructions and did so in the instant action. We find *Avila* and *Williams* controlling on the contentions raised by defendant and find no error in the trial court's denial of the new trial motion.

## DISPOSITION

The judgment is affirmed.